## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## NORTHERN DISTRICT OF MISSISSIPPI, EASTERN DIVISION

IN RE:TRIANGLE MAINTENANCE SERVICE, LLC  NO.: 11-15142-DWH
(DEBTOR)

---

TRIANGLE MAINTENANCE SERVICE, LLC   **PLAINTIFF**

V.      **ADVERSARY PROCEEDING NO. 12-01020-DWH**

LIBERTY MUTUAL INSURANCE COMPANY   **DEFENDANT**

### MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, Liberty Mutual Insurance Company ("Liberty Mutual") to file this, its Motion for Summary Judgment, and states as follows:

1. Panola Construction Company, Inc. ("Panola") is a general contractor that was selected by Hinds Community College to build the school's new facility in Rankin County. Among the various subcontractors Panola hired was Plaintiff Triangle Maintenance Service, LLC ("Triangle"), which it engaged to build "concrete – curb and gutter, sidewalks, concrete pavement, decorative concrete side walks [*sic*]" at the new facility.  Exhibit 1, Subcontract between Panola and Triangle, § 2.  The subcontract between Panola and Triangle was executed July 6, 2009.  Exhibit 1, Subcontract between Panola and Triangle.

2. Panola was required, pursuant to Mississippi Code § 31-5-3 *et seq.*, to be bonded for its work on the project.  Liberty Mutual acted as surety on Panola's bond, which covered Panola's performance and payment obligations.  Exhibit 2, Payment and Performance Bond.

3. As construction progressed the relationship between Panola and Triangle soured, with Panola expressing its dissatisfaction to Triangle regarding workmanship and staffing

(attached as Exhibits 3 – 5), and Triangle responding to the complaints (Exhibit 6). A February 11, 2011 email from a Panola supervisor reported that it "[l]ooks like [Triangle] may not return," and asks if left-behind equipment should be secured. Exhibit 7, Email from Ronnie Stepp to Jeff Papasan *et al.* Finally, on February 18, 2011, Panola notified Triangle in writing that it was terminating the subcontract due to poor workmanship and Triangle's refusal to adequately staff the project. Exhibit 8, Letter from Jeffrey Papasan to Stuart Smith.

4.      Triangle later filed for bankruptcy protection with this Court on November 3, 2011, and on February 17, 2012, it filed its current Complaint against Liberty Mutual, alleging that it is still owed $135,766.46 by Panola for its work on the Hinds Community College project. Triangle's Complaint, Docket item #1, ¶ 13. Thus, Triangle's Complaint seeks payment from Liberty Mutual pursuant to the bond on the project.

5.      Mississippi Code § 31-5-53 states:

(b) When suit is instituted on a payment bond given in accordance with this chapter, it shall be commenced within one (1) year after the day on which the last of the labor was performed or material was supplied by the person bringing the action and not later.

Mississppi Code § 31-5-53(b).

6.      The last date on which Triangle performed labor or supplied material to Panola on the Hinds Community College project was no later than February 11, 2011. Exhibit 9, Affidavit of Ronnie Stepp. Triangle did not file its Complaint until February 17, 2012. The Complaint is, therefore, barred by the statute of limitations.

7.      Pursuant to Uniform Local Bankruptcy Rules 7056-1(1)(A)(i)-(ii), Liberty Mutual states as follows:

(A)      The statute of limitations for Triangle's Complaint against Liberty Mutual is "one year after the day on which the last of the labor was performed or material was

supplied" by Triangle on the Hinds Community College project.  Mississippi Code § 31-5-53.

(B)     The date on which Triangle performed the last of its labor or supplied material on the Hinds Community College project is no later than February 11, 2011.  Exhibit 9, Affidavit of Ronnie Stepp.

(C)     Triangle filed its Complaint on February 17, 2012.  Triangle's Complaint, Docket item #1.

8.      Pursuant to Uniform Local Bankruptcy Rules 7056-1(3)(A), Liberty Mutual is contemporaneously filing a memorandum of authorities.  In further support of its motion, Liberty Mutual also attaches the following exhibits:

Exhibit 1 - Subcontract between Panola and Triangle

Exhibit 2 - Payment and Performance Bond

Exhibit 3 - December 28, 2010 letter from William Burnett to Stuart Smith

Exhibit 4 - January 27, 2011 letter from Jeffrey Papasan to Stuart Smith

Exhibit 5 - February 9, 2011 letter from Jeffrey Papasan to Stuart Smith

Exhibit 6 - February 10, 2011 letter from Scott Hannon to Jeffrey Papasan

Exhibit 7 - February 11, 2011 Email from Ronnie Stepp to Jeff Papasan *et al*

Exhibit 8 - February 18, 2011 letter from Jeffrey Papasan to Stuart Smith

Exhibit 9 - Affidavit of Rickey Moore

WHEREFORE, PREMISES CONSIDERED, Liberty Mutual prays that Triangle's Complaint against it will be dismissed with prejudice, with all costs taxed to Triangle.

Respectfully submitted,

LIBERTY MUTUAL INSURANCE COMPANY

By: _/s/ Frank E. McRae,_____
Frank E. McRae III, one of its attorneys

E. Stephen Williams (MSB 7233)
Frank E. McRae, III (MSB 10713)
YoungWilliams P.A.
P. O. Box 23059
Jackson, MS 39225-3059
Telephone: 601-948-6100
Fax: 601-355-6136
bmcrae@youngwilliams.com

## CERTIFICATE OF SERVICE

I, Frank E. McRae III, certify that on this day, I electronically filed the foregoing Notice

with the Clerk of the Court and served a copy of the foregoing document electronically to ECF

participants and via United States mail upon non-ECF participants requesting copies of pleadings

at the address of record.

John W. Crowell
jcrowell@tannerguincrowell.com

U. S. Trustee
USTPRegion05.AB.ECF@usdoj.gov

This, the ｜3ᵗʰday of December, 2012

_/s/ Frank E. McRae, III_
Frank E. McRae III





1 - PM   2 - PE

4 - AC   3 - PM

**Subcontract #908-2530-503**
**MS Contractor #**

This Subcontract is made the 8ᵗʰ day of JULY 2009 by and between Panola Construction Company, hereafter called the Contractor, and Hardin Maintenance Services Inc, hereafter called the Subcontractor. (Contact: Stuart Smith 662-226-6195 ) Address: 2041 Hwy 182 West Columbus MS 39701 Phone: 662-226-6195 Facsimile: 662-327-0060 Email: stuart@hardinmaintenanceservices.com

For the consideration stated hereafter and in exchange for the mutual covenants herein made, the Subcontractor and Contractor hereby agree as follows:

*Section 1.* The Subcontractor shall be bound to the Contractor by all terms and conditions of this Subcontract and by all terms and conditions of the Prime Contract between the Owner and Contractor, which is incorporated by reference into this Subcontract and is an integral part of this Subcontract. The Prime Contract includes, but is not limited to, the Agreement between the Contractor and the Owner; all general supplementary, special, and technical terms and conditions; all drawings, specifications, details, and standards; all addenda, modifications, and revisions to any of the foregoing; and all other documents incorporated or referenced by the foregoing as well as all work inferable from the plans and specifications. The Subcontractor shall assume toward the Contractor all the obligations and responsibilities which the contractor, by the Prime Contract, assumes toward the Owner, except that this Subcontract shall govern over any inconsistent provision of the Prime Contract. The Contractor shall have the same power of terminating this Subcontract that the Owner may exercise over the Contractor under the provision of the Prime Contract.

*Section 2.* The Subcontractor shall furnish all labor, materials, tools, equipment, facilities, supervision, management, financing, services, shop drawings, submittals, testing, applicable permits, and every other thing of whatever nature necessary to fully perform and in every respect complete the work generally described as follows: CONCRETE CURBS AND GUTTER, SIDEWALKS, CONCRETE PAVEMENT, DECORATIVE CONCRETE SIDEWALKS for the Project known as MULTI-PURPOSE CENTER HINDS COMMUNITY COLLEGE; located at 3805 Highway 80 East, Pearl MS 39208-4206; for the Owner, HINDS COMMUNITY COLLEGE ; according to plans and specifications prepared by DEAN AND DEAN / ASSOCIATES , hereafter referred to as the Architect.

The Subcontractor's work as generally described above shall be performed wherever required on the Project. Applicable attachments and/or specifications include, but are not necessarily limited to: Attachments A, B, C
The Subcontractor shall perform work in strict accordance with this Subcontract and with the Prime Contract which is made a part hereof. Anything pertaining to the Subcontractor's work that is mentioned in the specifications, but not shown in the drawings, or shown in the drawings, but not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. All work of the Subcontractor shall be subject to the direction of the Contractor and shall be subject to the approval of the Contractor, Architect, and Owner. The Subcontractor's work includes all work specifically set forth in this Subcontract and covered by parts of the Prime Contract applicable thereto, and it further includes everything reasonably necessary, inferable or customary for the proper execution, functioning, connection, and completion of all work referred to by this Subcontract.

*Section 3.* In exchange for the Subcontractor's full and timely performance of this Subcontract work in strict accordance with the terms and conditions of this Subcontract, the Contractor agrees to pay the Subcontractor the sum of SIX HUNDRED FORTY EIGHT THOUSAND SEVEN HUNDRED SEVENTY FIVE & NO/100 Dollars ($648,775.00), subject to any increase or decrease that may be agreed upon in writing and further subject to all provisions of this Subcontract:

*Section 4.* Time is of the essence of this Subcontract. The Subcontractor shall begin work when directed by the Contractor. The Subcontractor shall coordinate and continuously perform its work competently, efficiently, and at a speed so as to facilitate the general progress of the Project. The Subcontractor shall not delay, disrupt, damage, or render more expensive the work of the Contractor or any other subcontractor. If so ordered by the Contractor, the Subcontractor shall prosecute certain portions of the Subcontract work in preference to other portions, all on increase in Subcontract price. The Subcontractor shall reimburse the Contractor for any damages assessed by the Owner against the Contractor or otherwise incurred by the Contractor as a result of delays or difficulties caused by or attributable to the Subcontractor. Furthermore, the Subcontractor shall pay the Contractor's acceleration costs, extended job site overhead, unabsorbed home office overhead, and all other direct and indirect expenses of whatever nature, including attorneys' fees, caused in whole or in part by delays, disruptions, or other reasons attributable to the Subcontractor.
In the event the Subcontractor's work is delayed, disrupted, damaged, or rendered more expensive by the Owner, Contractor, or other subcontractors, the Subcontractor, as its sole and exclusive remedy, may upon written request properly made to the Contractor obtain time extensions and an increase in the Subcontract price to the extent of any amounts and time extensions that the Contractor, on behalf of the Subcontractor, actually receives from the Owner or from the responsible subcontractors for such delays, disruptions, damages, or added expense. As a condition precedent to any relief, the Subcontractor must give the Contractor written notice of delay, disruption, damage, and/or added expense to the Subcontractor's work within five (5) days after the Subcontractor first knew or should have known of such event.

*Section 5.* The work included in this Subcontract shall be performed subject to the direction of said Contractor and/or the Architect/Engineer, whose decision as to the true intent, proper construction, and correct meaning of the drawings and specifications shall be final.
Before proceeding with any work, the Subcontractor shall lay out and field measure all work, and the Subcontractor shall verify all previous and surrounding work done by others to ensure that all work fits and functions properly. The Subcontractor shall detect and, prior to commencement of work, report in writing to the Contractor any defect, interference, or nonconformity in the work of others or in the plans and specifications; and if the Subcontractor fails to do so, the Subcontractor shall be solely responsible for and bear all costs of any cutting, patching, rerouting, replacement, or other action which the Contractor directs to overcome or correct such problems.
The Subcontractor recognizes that it may be working concurrently with the Contractor, separate subcontractors, and others. The Contractor has the right to require the Subcontractor without cost or liability to the Contractor, to schedule work hereunder in such a manner as will minimize interference, delay and expense to and work of others.
If a question or dispute arises as to which subcontractor is responsible for any item of work, the Contractor and Architect/Engineer shall determine the responsible subcontractor and that subcontractor shall proceed immediately to perform the work at no additional cost to the Contractor. The Contractor shall have no liability for its decision. If the Contractor's decision is not



**EXHIBIT**

"1"

acceptable to all parties, any aggrieved subcontractor shall be entitled to resolve the matter through arbitration with other affected subcontractors in accordance with the rules of the American Arbitration Association. The Contractor shall not be included as a party in said arbitration, but the Contractor will make its records and employees reasonably available to all parties involved.

**Section 6.** The Subcontractor shall guarantee and warrant its work to be of good material and workmanship, free from defects, fit, sale, sufficient for the purposes intended and to comply strictly with the plans and specifications. This warranty shall extend for the same period as the Contractor's warranty under the Prime Contract or for one year after date of substantial completion, whichever is longer. The warranties and guarantees set forth herein are in addition to any other warranties or guarantees required by the Prime Contract, provided by law, or set forth by separate agreement.

**Section 7.** If required by the Contractor prior to or during performance of this Subcontract, the Subcontractor shall furnish to the Contractor, as obligee, a performance and payment bond with a responsible surety, acceptable to the Contractor, for the amount of this Subcontract covering the Subcontractor's faithful performance of this Subcontract and prompt payment for all equipment, machinery, supplies, materials, services and labor furnished and supplied to the Subcontractor. The Subcontractor's failure to deliver satisfactory bonds within ten (10) days after demand shall be a material breach of the Subcontract.

**Section 8.** By the 20th of each month, the Subcontractor shall present to the Contractor an itemized statement of the work done during the previous thirty (30) days which statement when checked and approved by the Contractor, will be forwarded to the Owner's representative for payment. Notwithstanding anything to the contrary in this Subcontract, in the Contractor's contract with the Owner, or in any bond or other document, the Owner's approval of the Subcontractor's work for which payment is requested and the Contractor's actual receipt of payment from the Owner for such work shall both be absolute conditions precedent to Subcontractor's right to any form of payment whatsoever from the Contractor.

Subject to the terms and conditions of this Subcontract, the Contractor agrees to pay the Subcontractor's application for payment within seven (7) working days after the Contractor receives payment from the Owner for the Contractor's application in which the Subcontractor's application is incorporated. Should the Subcontractor's portion of the Contractor's application for payment be reduced for any reason, payment to the Subcontractor will be reduced accordingly.

The Contractor may, at its option, withhold up to ten percent (10%) retainage from payments otherwise due the Subcontractor hereunder until final payment. Final payment and release of retainage shall be made at the completion of the work covered by this Subcontract, but only: (1) upon written acceptance thereof by the Contractor, Architect, and Owner; (2) after Subcontractor has provided documentation specified by the Prime Contract or by this Subcontract or as otherwise reasonably required by the Contractor; and (3) as a condition precedent, the Owner has made final payment and has released retainage to the Contractor.

Acceptance of final payment by the Subcontractor constitutes a general release of the Contractor and the Contractor's surety from all claims and liability of whatever nature. No payment, including final payment, shall be construed as acceptance of defective or incomplete work, and the Subcontractor shall remain responsible and liable for performance in strict compliance with this Subcontract.

**Section 9.** Before submitting any application for payment, the Subcontractor shall have paid all material, labor, equipment, and other bills and obligations that relate to this Subcontract, through the period covered by previous payments received from the Contractor, and the Subcontractor shall furnish, at Contractor's request, affidavits, lien releases, and other such evidence as Contractor may require to verify compliance with this requirement. As a condition precedent to final payment to the Subcontractor, the Subcontractor shall furnish Contractor an affidavit of payment of all bills and obligations, a release of liens or other encumbrances respecting the Project, and a general release of claims together with such affidavits and other documents as may be required by the Contractor.

In the event suit is filed by any person or entity asserting a claim or lien with respect to work covered by this Subcontract, the Subcontractor will, at its own expense, including attorneys' fees, defend such suit and pay any judgment rendered therein.

**Section 10.** The Subcontractor shall, at all times, furnish and maintain; adequate tools, facilities and equipment; sufficient numbers of qualified workmen; at least one competent, non-working superintendent present at the Project site at all times as Subcontractor performance; all materials and supplies which must comply strictly with the contract documents; and any other thing necessary or desirable so as to enable the Subcontractor to prosecute its work efficiently and properly. The Subcontractor shall promptly pay for all materials purchased, labor employed, independent contractors engaged, and equipment rented.

The Subcontractor hereby agrees that the Contractor has the right to pay any bills or past due obligations of the Subcontractor arising on this job, including back-charges owed to the Contractor. Any such payments made by the Contractor, whether by joint check, direct payment, offset or otherwise, shall apply as a payment of earned proceeds (exclusive of retainage) on this Subcontract.

The Subcontractor shall pay all of the expense, cost and attorneys' fees incurred by the Contractor and by the Subcontractor's surety in the investigation and defense of any claim, demand, or action by any third party alleging the Subcontractor's nonpayment of labor or material or alleging the Subcontractor's failure to perform obligations under this Subcontract, whether or not such allegations are valid.

Nothing in this paragraph or elsewhere in this Subcontract is intended nor shall be construed to create any rights for or to bestow any benefits upon third parties.

**Section 11.** Should the Subcontractor fail to operate in the ordinary course of business or, at any time, refuse, neglect, or fail: to furnish and maintain sufficient labor, material, equipment, services, or supervision, or to pay for labor, equipment or material used by the Subcontractor, or to prosecute the work covered by this Subcontract with promptness and diligence so as not to delay its work, the work of others, or the Project as a whole, or to perform any term or condition of this Subcontract, all of which are considered material, then upon any one of these events, the Contractor may, at its option, after three (3) days written notice to Subcontractor, or such shorter time as may be appropriate under the circumstances, either (1) supplement the Subcontractor with labor, material, and equipment; or (2) terminate this Subcontract in whole or in part and complete the action which the Contractor in good faith deems reasonable under the circumstances. In the event of any failure or inadequacy of performance by the Subcontractor, the Subcontractor shall be liable to the Contractor for all expenditures made and all damages, losses, expenses, attorneys' fees, and costs of whatever nature, incurred by the Contractor in supplementing the Subcontractor, in completing the Subcontract, or otherwise as a result of Subcontractor's performance delays or failures.

In the event of termination of this Subcontract, in whole or in part, the Contractor may, at its option and without prejudice to or waiver of any other right or remedy, take possession of materials, tools, equipment, facilities, and other property belonging to Subcontractor at the Project site and assume complete control of the Subcontract work, in case of partial or total termination of this Subcontract. Subcontractor shall not be entitled to receive any further payment under this Subcontract until Subcontractor's entire work shall have been finished completely and final payment for same has been made by the Owner and received by the Contractor. If the charges, losses, expenses, attorneys' fees, and damages sustained by the Contractor in completing the Subcontract work or otherwise attributable to Subcontractor's performance delays or failures exceed the unpaid portion of the Subcontract amount, the Subcontractor shall pay the difference to Contractor within five (5) days after demand for same by Contractor. Upon partial or total termination of this Subcontract, the Subcontractor shall not be entitled to any payment in excess of the reasonable value of work actually performed by the Subcontractor in strict accordance with the contract documents, less offsets and other amounts due the Contractor under this Subcontract.

**Section 12.** Subcontractor is at all times and in all respects an independent contractor and is not an agent of Contractor. The Subcontractor shall have no authority to bind the Contractor by any representation, promise, or statement of any kind without first obtaining the Contractor's specific written consent and authorization. The Subcontractor shall not interfere with the Contractor's relationship with the Owner or with other subcontractors.

The Subcontractor shall not deal directly with either the Owner or the Architect without prior written authorization in each instance from the Contractor. The Subcontractor agrees not to enter into any other contract relating to this Project without the Contractor's prior written consent.

The Subcontractor has exclusive liability for all contributions, taxes, deposits, and payments required of employers by federal, state, or local governments, with respect to wages, salaries, remuneration, or benefits paid or owed by the Subcontractor to any of Subcontractor's employees or others who perform work or render services for Subcontractor in connection with this Subcontract. The

Subcontractor has exclusive liability for all income, gross receipts, sales, use, or other taxes applicable to materials, equipment, labor, or performance of work pursuant to this Subcontract.

The Subcontractor shall comply with all laws, ordinances, building codes, safety requirements, and regulations of whatever nature that applies to this Subcontract and that are otherwise effective where the work under this Subcontract is to be performed.

Subcontractor specifically agrees that, before it moves man, material and equipment to the project, and continually thereafter, to examine, test and inspect all hoists, scaffolding, platforms and other work areas whether installed itself or by others, to assure that said facilities and work areas are safe; and Subcontractor assumes full responsibility for any damage caused by any such facilities or work areas which are unsafe.

*Section 13.* The Subcontractor shall obtain, before commencement of work, and maintain until final acceptance of the Prime Contract, full insurance coverage, including as a minimum the same types of insurance at the same policy limits which are specified by the Prime Contract or which the Contractor actually obtains for this Project, whichever are greater. The Subcontractor is hereby made responsible for determining the types and extent of such additional insurance as many be necessary to give adequate and complete protection to the Subcontractor, the Contractor, and the Owner from claims for property damage and from claims for personal injury, including death, which may arise from or be conjunctured with this Subcontract, whether such claims relate to acts of omissions of Subcontractor, of any of its subcontractors, or anyone directly or indirectly employed by any of them. If the Contractor or the Owner carries builder's risk or other insurance which may apply to the Subcontractor's work or which otherwise may inure to the benefit of the Subcontractor, the Subcontractor shall be responsible for all deductibles and for any inadequacy or absence of coverage, and the Subcontractor shall have no claim or other recourse against the Contractor or against the Owner for any costs or loss attributable to such deductibles or coverage limitations.

Prior to execution of this Subcontract, the Subcontractor shall deliver to the Contractor Certificates of Insurance, certifying the types and amounts of coverage, certifying that said insurance will be in force before Subcontractor starts work, and certifying that said insurance applies to all activities and liability of the Subcontractor pursuant to this Subcontract. No policy of insurance may be canceled or reduced during the period of construction, and the Subcontractor shall obtain an endorsement to its policies and insurance certificates providing substantially as follows:

Insurer shall not cancel this policy or reduce coverage for a period of ten (10) days after Panola Construction Company has acknowledged receipt of written notice of the insurer's intention to cancel or reduce the coverage.

The insurance and indemnity obligations of this Subcontract are non-delegable. The Subcontractor shall not sublet nor subcontract any part of this Subcontract without retaining absolute responsibility for requiring similar insurance from its subcontractors and suppliers. The Subcontractor's failure to maintain complete insurance shall be a breach authorizing the Contractor, at the Contractor's sole election, either to terminate this Subcontract or to provide full insurance coverage at the Subcontractor's sole expense; however, in neither case shall the Subcontractor's liability be lessened.

*Section 14.* The Subcontractor covenants to defend, indemnify, save harmless, protect, and exonerate both the Contractor (its agents, employees, representatives, and sureties) and the Owner from any and all liability, claims, losses, suits, actions, demands, arbitrations, administrative proceedings, awards, judgments, expenses, attorneys' fees and costs pertaining to economic loss or damages, labor disputes, nonperformance of obligations, personal injury, death, or property damage which arise from or are connected with any other act or omission relating to the Subcontractor or to this Subcontract. The foregoing covenants and indemnity obligations shall apply to the fullest extent permitted by law, excepting only liability which is imposed exclusively because of the Contractor's sole negligence. The Subcontractor's liability insurance policies shall each contain contractual insurance coverage (including but not limited to products liability and completed operations) so as to protect fully the Subcontractor, Contractor, and Owner.

*Section 15.* The Subcontractor shall not subcontract nor assign any part of this Subcontract without first obtaining the written consent and approval of the Contractor.

Assignments of Subcontract proceeds are permissible but only if written notice of same is received and acknowledged in writing by a corporate officer of the Contractor at least thirty (30) days before the assigned proceeds are due and payable to the Subcontractor. The Subcontractor and the Subcontractor's assignee shall require that the assignment of Subcontract proceeds does not adversely affect the performance of this Subcontract, including the full and timely payment of all bills and obligations owed by the Subcontractor. To the extent Subcontract proceeds paid to the Subcontractor's assignee exceed funds made available by the assignee that are actually used to pay for Subcontract work and materials, the Subcontractor and the Subcontractor's assignee hereby agree to indemnify, defend, save harmless, and exonerate the Contractor from any loss, liability, or expense (including attorneys' fees) which the Contractor incurs or which is claimed against either the Contractor or the Contractor's surety as a result of the Subcontractor's failure to perform work in accordance with this Subcontract or as a result of the Subcontractor's failure to pay its bills and discharge its obligations relating to this Subcontract. Any assignment of Subcontract proceeds and any payments made pursuant to assignments shall be subject to and conditioned upon the Subcontractor's compliance with all terms and conditions of this Subcontract, and any such assignments are expressly restricted to the amount actually collected by the Contractor from the Owner for work performed by the Subcontractor and accepted by the Owner, less retainage, back-charges, or other offsets which are chargeable by the Contractor against the Subcontractor, whether on this project or otherwise. Acknowledgment, acceptance, or approval of an assignment by the Contractor does not constitute any representation or agreement by the Contractor that the Subcontractor is owed the amount assigned or any specific amount whatsoever.

*Section 16.* The Subcontractor shall have at least one competent superintendent present at the Project at all times work of Subcontractor is being performed or is scheduled to be performed. Said superintendent shall have absolute authority, in all respects, to act for and on behalf of the Subcontractor and to bind the Subcontractor. The Subcontractor shall replace said superintendent or any other employee, without additional charge, if so demanded by the Contractor. The Subcontractor shall do, without additional charge whatever is necessary in the performance of this Subcontract or as the Contractor otherwise directs to assure harmonious labor relations at the Project and to prevent strikes or other labor disputes.

*Section 17.* The Subcontractor shall contribute to keeping the Project in a clean and neat condition. Should the Subcontractor fail to do so promptly upon notice, the Contractor may at its option, cause same to be removed at the Subcontractor's expense. Upon completion of various portions of its work, the Subcontractor shall broom clean its work areas and do whatever else is necessary to put its work in proper condition for application or performance of follow-on-work.

*Section 18.* The Contractor may make changes in the work to be performed by Subcontractor by issuing written change orders to this Subcontract without notice to the Subcontractor's sureties. Changes may be additive or deductive. The Subcontractor shall be obligated to perform in accordance with such change orders, and the Subcontract sum shall be adjusted as specified by such change order. No alterations or changes shall be made except upon the Contractor's written order; oral changes to the Subcontract work are not valid and will not be recognized. The Subcontractor shall have no claim or entitlement to payment for any addition to work or change in work unless, prior to commencement of performance, the Subcontractor receives a written change order for such work from an authorized representative of the Contractor.

The Subcontractor shall give written notice of any claims for extra compensation, of whatever nature, at least five (5) working days prior to the time the Prime Contract requires the Contractor to give notice of same to its Owner. The Subcontractor shall be entitled to an increase in the Subcontract price and/or extension of the Subcontract time for changes in its work, but only to the extent of any amounts and time extensions that the Contractor, on behalf of the Subcontractor, actually receives from the Owner for such changes.

*Section 19.* The Subcontractor shall provide sufficient, safe and proper facilities, equipment, and working conditions, which shall at all times be subject to inspection by Contractor, the Owner, or their authorized representatives. The Subcontractor shall, within twenty-four (24) hours after written notice from the Contractor, proceed to take down and remove from the premises of the Project all portions of the work and all material, whether worked or un-worked, which the Contractor shall deem as unsound or improper or which fails to conform in any way to the contract documents, including this Subcontract. The Subcontractor shall make good all such condemned work, equipment, and facilities and restore all other work damaged or destroyed in removing or making good such condemned items, and all

Subcontractor's sole risk and expense. However, Subcontractor shall not remove any other materials from the Project site without Contractor's written permission.

**Section 20.** Subcontractor agrees to abide by Contractor's decisions as to allotment of all storage and working space at the Project site and as to all other matters respecting the organization, flow, coordination, and sequencing of work.

**Section 21.** The Subcontractor shall not place signs of any kind upon the Project site without prior written approval of the Contractor.

**Section 22.** In the event of any dispute between the Subcontractor and the Contractor, the Subcontractor shall be bound by the procedures and requirements of the Prime Contract for arbitration or other means of resolving disputes to the same extent that the Contractor is bound to the Owner. If so requested in writing by the Contractor, the Subcontractor agrees to join and/or consolidate any claims against the Contractor or Owner in the same forum and the same proceeding in which claims and disputes between the Contractor and the Owner are filed. The locale for any arbitration involving the Subcontractor and the Contractor shall be Batesville, Mississippi, unless the Contractor designates another locale to facilitate joinder of parties and consolidation of claims.

Should the Contractor through litigation, arbitration, or other means seek enforcement of any of the provisions hereof or seek to protect its interests in any matter arising under this Subcontract, or seek to collect damages for the breach of this contract, or seek to prosecute or defend any suit resulting from this Subcontract, or seek to recover on the performance and payment bond given by the Subcontractor under this contract, the Subcontractor and his surety, jointly and severally, agree to pay Contractor all costs, expenses, and attorneys' fees incurred in the investigation, preparation, and trial or hearing of such matters and otherwise reasonably related thereto.

No claim or dispute shall interfere with the progress of construction, and the Subcontractor shall proceed diligently with performance of this Subcontract, notwithstanding the existence of any claim or dispute.

**Section 23.** All proposals, negotiations, and representations with respect to this Subcontract, whether oral or written, are hereby superseded and merged into this Subcontract. This Subcontract cannot be changed, modified, altered, suspended, or terminated, except in writing signed by an officer of the company. No delay, waiver, forbearance, or failure by the Contractor to exercise rights or remedies under this Subcontract or to insist upon strict compliance by the Subcontractor shall relieve the Subcontractor from strict compliance with all terms and conditions hereof nor shall waive, restrict, or adversely affect any of the Contractor's rights and remedies as to any subsequent or continuing failure of the Subcontractor to comply strictly with all terms and conditions of this Subcontract. The invalidity or unenforceability of any term or condition of this Subcontract shall not invalidate, render unenforceable, or adversely affect the remaining terms and conditions. The laws of the State in which the Project is located shall govern this Subcontract. The Subcontractor shall be liable for all damages, costs, and expenses, including attorneys' fees incurred by the Contractor in enforcing the terms and conditions of this Subcontract. This Subcontract shall be binding upon the successors in interest of the parties hereto. The Subcontractor and Contractor represent that this Subcontract is executed by one of its authorized representatives acting within the scope of his authority.

IN WITNESS WHEREOF, authorized representatives of the parties hereto execute this Subcontract to be effective on the date first written above.

Subcontractor:   Triance Maintenance Service, L.L.G.s

By: _____

Title: _____  Manager

Contractor:   PANOLA CONSTRUCTION CO., INC.

By: _____

Officer: _____  William F. Burnett, President



**ATTACHMENT A**

Multi-Purpose Center for Hinds Community College

SUBCONTRACT #008-2530-608

Triangle Maintenance Service, LLC

July 8, 2009

In addition to the foregoing Subcontract Sections 1 through 23, this Subcontract includes, but is not necessarily limited to the following:

1.  Proof of the required minimum insurance coverage listed below must be provided to Panola Construction Company before any work described in this Subcontract Agreement is performed. Additionally, this Agreement will not be signed and will be null and void if the minimum insurance requirements are not in force from the beginning and during the entirety of the Work described in this Agreement.
    a)  COMPREHENSIVE GENERAL LIABILITY:    A minimum of $1,000,000 each occurrence <u>and</u> $1,000,000 general aggregate.
    b)  WORKER'S COMPENSATION:  Standard Worker's Compensation insurance with limits and benefits in accordance with the laws of the State of <u>MISSISSIPPI</u>.    An alternative plan to Worker's Compensation insurance will not be acceptable.
    c)  COMMERCIAL AUTOMOBILE LIABILITY:  Auto liability covering all owned, non-owned, and hired automobiles used in connection with the Work with the following limits:
        i)    Bodily Injury - each person ............................................................. $500,000 and,
        ii)   Bodily Injury- each occurrence .................................................. $1,000,000 and,
        iii)  Property Damage - each occurrence: ............................................ $500,000 <u>OR</u>
        iv)   Each accident or combined single limit ...................................... $1,000,000
        v)    Subcontractors owning no "company" vehicles are not exempt from providing this coverage.
    d)  Panola Construction Company must be named as an additional insured on the General Liability and Automobile Liability certificates.
    e)  Each insurance certificate must include a Waiver of Subrogation in favor of Panola Construction Company for the General Liability and Worker's Compensation policies.
    f)  Each Insurance certificate must be designated as specific to this Project.

2.  Subcontractor shall familiarize himself with and abide by the safety rules and regulations of the General Contractor, as well as the safety laws, rules and regulations of any governmental body having the authority to control the manner or method of carrying out the Work, including, but without limitation to, the Williams-Steiger Occupational Safety and Health Act of 1970 (OSHA), all rules and regulations established pursuant thereto, and all amendments and supplements thereto. These "Safety Requirements" are intended to set forth a minimum standard of safety. Subcontractor shall establish and enforce such other safety measures as may be required by the nature of the Work.

3.  Without limiting the foregoing, Subcontractor shall specifically abide by the following:
    a)  Furnish and require all of his employees, invitees, visitors, and suppliers to wear hard hats and eye protection whenever they are on the jobsite.
    b)  Work on platforms and scaffolding that conform to OSHA requirements.
    c)  Use safety harnesses when working in areas not protected by handrails.
    d)  If, in connection with the performance of the Work, it becomes necessary to have access to any openings or shafts or to remove any handrails, Subcontractor shall see that the openings or shafts are adequately protected while the work is in progress and covers or handrails are replaced before cessation of the Work.
    e)  Require his superintendent, foremen and all of his employees to hold weekly safety meetings, and provide copies of safety meeting report to General Contractor's superintendent.
    f)  Provide his job supervisor and the General Contractor's superintendent with an "emergency list" showing the company doctor, hospital, insurance company, etc. Furnish the job with a first aid kit or

Attachment A – Subcontract #908-2530-503                                                          Page 2
of 4
Revised 01/07

        send your first aid type injuries to your company doctor. The General Contractor's first aid kit is not available to Subcontractor's employees.

  g)  Furnish General Contractor with a report of any accidents involving employees of Subcontractor or any accidents involving the General Contractor's employees or equipment.

  h)  Furnish his own fire extinguishers when his equipment or materials produce an unusual fire hazard, e.g., welding, cleaning solvents, the use of tar pots, etc.

  i)  Use reasonable care to make and keep the jobsite safe for the use of his employees, the General Contractor's employees, and all other persons upon the site.

  j)  Panola Construction Company's Hazards Communication Policy (required by the U. S. Department of Labor) can be reviewed at the jobsite office. When returning your signed Subcontract Agreement, a copy of your Hazards Communication Standard Policy should be attached. In addition, "Material Safety Data Sheets" (MSDS) for all products that you intend to use on this project must be provided. Any materials that are not accompanied by MSDS sheets will be removed from the jobsite until the sufficient information is received.

  k)  Subcontractor must have his own assured equipment grounding conductor program if ground-fault circuit interrupters are not used at the project.

  l)  Precast, formwork, and masonry Subcontractors (or other Subcontractors that may be affected) acknowledge that they are aware of and will comply with Subpart Q of 29 CFR Part 1926, Concrete and Masonry Construction Safety Standards.

4.  To further Panola Construction Company's goal of providing a safe work environment for its employees, adherence to the following is required:

  a)  The possession, use or distribution of Prohibited Substances is not permitted in any office, work location or facility of Panola Construction Company (Company Premises). Prohibited Substances include alcoholic beverages, intoxicants or narcotics, illegal drugs, simulated "look alike" drugs, drug paraphernalia, inhalants, and prescription drugs which may adversely affect working ability. Employees are not permitted to report to work while under the influence of alcohol or when detectable levels of other Prohibited Substances are present in their system. Employees will inform Panola Construction Company when they are taking medication which might impair their ability to operate equipment or otherwise work safely on the job.

  b)  No firearms, unauthorized explosives, or weapons of any kind are allowed on Company Premises.

  c)  Entry onto Company Premises is conditioned on the Company's right to search the person, personal effects, and vehicles of any entrant for Prohibited Substances. Individuals may be tested to determine the presence of Prohibited Substances. Tests may occur as a result of:

    i)  pre-employment examinations,

    ii)  reasonable suspicion of use, or

    iii)  direct or indirect involvement in an employment related injury.

  d)  Searches may involve the use of electronic detection devices, scent trained dogs, or the taking of urine or other samples for testing.

  e)  Individuals who fail to abide by the above rules or who refuse to submit to a search or test will be subject to appropriate disciplinary action up to and including termination and/or permanent removal from Company Premises. This policy extends to all personnel who enter a Panola Construction Company job site including employees, agents, or invitees of Panola Construction Company, its Subcontractors, and vendors.

5.  If Subcontractor's foreman and all employees do not comply with the above, General Contractor has the authority to require the Subcontractor to remove the employee and/or the foreman from the project and, if the foreman is removed, Subcontractor agrees to provide a new foreman who will enforce the safety rules.

6.  Subcontractor agrees to indemnify and hold harmless the General Contractor from and against any liability, damages, fines, costs and attorney's fees on account of Subcontractor's failure to comply with all health and safety laws, ordinances, rules, regulations or orders applicable to the Work.

7.  The Subcontractor's Superintendent shall be in attendance on a full time basis at the site. The Subcontractor's Project Manager, Superintendent and other key personnel will be engaged in the prosecution of the Work continuously until their role is completed unless prior release is approved or directed by the General Contractor or unless such personnel shall cease to be employed by the Subcontractor. Selection, replacement of, or addition to such key personnel shall be similarly subject to

prior approval by the General Contractor. Subcontractor further agrees not to remove from the Work any employee which the General Contractor considers to be necessary for the proper performance of the Work without the prior approval of the General Contractor and until the selection of a substitute approved by the General Contractor.

8.  The Subcontractor shall have a competent superintendent that will be available or accessible on a 24 hour basis in the event of an emergency. Subcontractor will provide the General Contractor with an emergency phone number list of key personnel for this job including his Sub-Subcontractors.

9.  Subcontractor's foreman is responsible each day for the following:
    a)  Check-in with the Project Superintendent upon arrival to the jobsite.
    b)  Report any problems or delays encountered or foreseen to the Project Superintendent.
    c)  Report any accidents (even minor accidents) to the Project Superintendent.
    d)  Discuss the activities planned for the following day with the Project Superintendent.
    e)  Check out with Project Superintendent before leaving the site.
    f)  Subcontractor's jobsite Superintendent or Foreman will fill out the Subcontractor's Daily Report form provided in this subcontract package and turn in to Panola Construction's Superintendent on a daily basis.

10.  Layout: General Contractor will establish centerlines and/or offset lines and bench marks as required on each floor for Subcontractor's use. Subcontractor will accomplish his own engineering and layout from these references and be responsible for the location of his own work.

11.  Subcontractor will not use the project as storage yard or for the storage of his material, except as agreed upon in writing with the General Contractor.

12.  No one shall sign a delivery ticket or authorize extra work for Panola Construction Company except the Project Superintendent or Project Manager.

13.  No radios are allowed on the project site for any use other than communications.

14.  Subcontractor will provide all required hoisting and rooftop access for personnel necessary for the respective work of this Subcontract.

15.  The Subcontractor is responsible for collection and disposal of work related trash to a point outside the building as designated by the General Contractor. Subcontractor must provide daily cleanup. All waste, scraps, and debris must be disposed of and removed from the site by the responsible trade. This includes bags, cans and wrappers from lunch and other breaks. Subcontractor will be required to furnish manpower to supplement a composite crew as needed for overall project cleanup, as directed by the Project Superintendent.

16.  The "*Billing Instructions*" included in this subcontract package is considered a part of this Subcontract.

17.  Two lien release forms are included in this subcontract package. By signing this Subcontract, Subcontractor agrees to submit the "*Affidavit of Payment, Waiver of Lien, and General Release of Claims*" form with each progress payment billing and the "*Affidavit of Final Payment, Waiver of Lien, and General Release of Claims*" form with the final billing. Any billing (progress or final) that does not include the required lien release form will be returned to the Subcontractor unprocessed.

18.  Sales and Use taxes: The Subcontract price includes all APPLICABLE taxes.

19.  The Subcontractor agrees to provide complete back-up on all requests for pricing (RFP). At a minimum, the back-up should contain the following:

    a)  Taxable materials, service, and sales tax.
    b)  Labor and other services.
    c)  Any quantity or unit price information required for analyzing pricing as may be requested by the Project Manager.

Attachment A – Subcontract #908-2530-503
of 4
Revised 01/07

Page 4

20.  This Subcontract is based on Plans and Specifications listed on *Attachment B*, dated April 23, 2009.

21.  All submittals required by specification should be provided by July 14, 2009. Allow 28-days for submittal review plus the duration required for release, fabrication, shipping, etc., so that all materials are on-site prior to the scheduled installation date.

22.  The Subcontractor acknowledges and accepts the Project Schedule included as *Attachment C*, dated July 8, 2009 and as updated monthly, and recognizes the critical nature of the schedule. The Subcontractor further agrees to take whatever steps necessary to perform the scope of work covered by this subcontract in conformance with the Project Schedule so as not to delay subsequent work performed by other trades. The Project Schedule will be updated periodically and the Subcontractor will receive copies these updates. If the Subcontractor fails to comply with the Project Schedule, and this failure to comply results in delays in the Subcontractor's work or the work of others, the Subcontractor agrees to accelerate the scope of work covered by this subcontract and/or accept the costs associated with getting the delayed parties back on schedule.

23.  This Subcontract includes, but is not limited to the following:

a)  The scope of work includes all work associated with DIVISION TWO-CONCRETE CURB AND GUTTER AND PAVING,SIDEWALKS ETC LISTED BELOW AND ON QUOTE DATED MAY 27,2009 - BASE BID AND ALTERNATE #1 .

b)  The scope of work includes any permits or fees required by the City of Pearl, Mississippi.

c)  The scope of work includes coordination of work with construction schedule.

d)  The scope of work includes the items listed per plans and specs:

- Concrete Curb & Gutter

- Concrete Sidewalks (Decorative and standard broom finish)

- Concrete pavement

e)  Panola Construction Company has applied for a MPC (Materials Purchase Certificate) for this project. The number will be provided when available.

f)  Excludes : Concrete brick border, ADA pavers, Testing and layout, Taxes and Bond

Initial here:  _____  Triangle Maintenance Service, LLC.



**ATTACHMENT B**

Multi-Purpose
Center
Hinds Community College

Redrawings
Subcontract # 908-2530-503
July 15, 2009

Index of Drawings

| ARCHITECTURAL | FOOD SERVICE | MECHANICAL |
|---|---|---|
| | | |

CIVIL / LANDSCAPE

STRUCTURAL

ELECTRICAL

## INDEX OF SPECIFICATIONS

**DIVISION 0**          Bidding and Contract Requirements

Section 00003          Advertisement For Bids
Section 00200          Instruction To Bidders
Section 00250          Site Information For Bidders
Section 00410          Bid Form
Section 00431          Supplement A - List of Subcontractors
Section 00500          Agreement
Section 00590          Contracting Forms and Supplements
Section 00600          Contract Bonds
Section 00650          Certificate of Insurance
Section 00700          General Conditions
Section 00800

**DIVISION 1**          General Requirements

Section 01050          Field Engineering
Section 01100          Summary of Work
Section 01200          Price and Payment Procedures
Section 01210          Allowances
Section 01230          Alternatives
Section 01300          Administrative Requirements
Section 01326          Construction Progress Schedule
Section 01400          Quality Requirements
Section 01500          Temporary Facilities And Controls
Section 01510          Temporary Utilities
Section 01525          Field Offices
Section 01585          Project Signs
Section 01600          Product Requirements
Section 01700          Execution Requirements
Section 01780          Closeout Submittals

**DIVISION 2**          Sitework

Section 02211          Earthwork (Building)
Section 02230          Site Clearing
Section 02300          Earthwork
Section 02361          Soil Treatment For Termite Control
Section 02385          Segmental Block Retaining Wall System
Section 02535          Architectural Site Concrete
Section 02630          Storm and Subsurface Drainage
Section 02660          Lake Liner
Section 02740          Asphaltic Concrete Paving
Section 02750          Concrete Paving and Surfacing
Section 02770          Concrete Curbs and Gutters
Section 02775          Concrete Walks
Section 02785          Unit Pavers
Section 02800          Site Amenities
Section 02803          Lake Fountains / Aeration
Section 02810          Irrigation Systems
Section 02837          Seawall
Section 02841          Decorative Steel Bollards
Section 02920          Grassing
Section 02950          Plant Material

**DIVISION 3**          CONCRETE

| Section 03100 | Concrete Formwork |
| Section 03200 | Concrete Reinforcement |
| Section 03300 | Cast-in-place Concrete |

**DIVISION 4**        MASONRY

| Section 04065 | Masonry Grout |
| Section 04810 | Unit Masonry Assemblies |

**DIVISION 6**        METALS

| Section 05120 | Structural Steel |
| Section 05210 | Steel Joists |
| Section 05311 | Steel Deck |
| Section 05400 | Cold Formed Metal Framing |
| Section 05500 | Metal Fabrications |
| Section 05510 | Metal Stairs |
| Section 05513 | Aluminum Plate Column Cover |
| Section 05520 | Handrails and Railings |
| Section 05522 | Tempered Glass Railing Assemblies |
| Section 05810 | Expansion Joint Cover Assemblies |

**DIVISION 6**        WOOD AND PLASTIC

| Section 06114 | Wood Blocking and Curbing |
| Section 06400 | Architectural Woodwork |
| Section 06420 | Panel Grille Wood Wall System |

**DIVISION 7**        THERMAL AND MOISTURE PROTECTION

| Section 07115 | Bituminous Dampproofing |
| Section 07130 | Sheet Waterproofing |
| Section 07212 | Board and Batt Insulation |
| Section 07260 | Weather Barriers |
| Section 07410 | Corrugated Metal Wall Panel System |
| Section 07411 | Metal Roof Panels |
| Section 07415 | Factory –Assembled Metal Wall Panels |
| Section 07432 | Aluminum -Composite Wall Panels |
| Section 07540 | Thermoplastic Membrane Roofing |
| Section 07620 | Sheet Metal Flashing and Trim |
| Section 07631 | Gutters and Downspouts |
| Section 07710 | Manufactured Roof Specialties |
| Section 07724 | Roof Hatches |
| Section 07815 | Sprayed –On Fireproofing |
| Section 07840 | Firestopping |
| Section 07900 | Joint Sealers |

**DIVISION 8**        DOORS AND WINDOWS

| Section 08110 | Hollow Metal Doors and Frames |
| Section 08211 | Flush Wood Doors |
| Section 08330 | Coiling Counter Shutters |
| Section 08330 | Overhead Coiling Doors |
| Section 08410 | Metal-Framed Storefronts |
| Section 08710 | Door Hardware |
| Section 08800 | Glazing |
| Section 08910 | Metal –Framed Curtain Wall |

**DIVISION 9**        FINISHES

| Section 09260 | Gypsum Board Assemblies |

Attachment B –Subcontract #908-2530-503
Revised 01/07

| Section 09300 | Tile |
| Section 09400 | Precast Terrazzo Flooring Specification |
| Section 09511 | Suspended Acoustical Ceilings |
| Section 09605 | Concrete Floor Stain |
| Section 09642 | Stage Wood Flooring |
| Section 09650 | Resilient Flooring |
| Section 09671 | Seamless Flooring |
| Section 09680 | Carpet |
| Section 09720 | Wall Covering |
| Section 09850 | Acoustical Panels |
| Section 09900 | Paints and Coatings |
| Section 09935 | Polymer Paint |

**DIVISION 10        SPECIALTIES**

| Section 10171 | Solid Plastic Toilet partitions |
| Section 10240 | Equipment Screens |
| Section 10265 | Protective Wallcovering |
| Section 10350 | Flagpoles |
| Section 10441 | Signage |
| Section 10523 | Fire Extinguishers, Cabinets and Accessories |
| Section 10615 | Demountable Partitions |
| Section 10651 | Operable Panel Partitions |
| Section 10800 | Toilet Accessories |

**DIVISION 11        EQUIPMENT**

| Section 11132 | Projection Screens |
| Section 11165 | Dock Bumpers |
| Section 11400 | Food Service Equipment |

**DIVISION 12        FURNISHINGS**

| Section 12492 | Horizontal Louver Blinds |

**DIVISION 14        CONVEYING SYSTEMS**

| Section 14201 | Passenger Elevators |
| Section 14271 | Elevator Cabs and Hoistway Doors |

**DIVISION 15        MECHANICAL CONSTRUCTION**

| Section 15010 | General Provisions |
| Section 15020 | Codes and Standards |
| Section 15030 | Mechanical Systems Schedule |
| Section 15075 | Mechanical Identification |
| Section 15100 | Excavation, Trenching, and Backfilling |
| Section 15110 | Pipe and Fittings |
| Section 15120 | Valves |
| Section 15130 | Piping Specialties |
| Section 15140 | Mechanical Devices |
| Section 15160 | Mechanical Systems Insulation |
| Section 15200 | Domestic Water System |
| Section 15250 | Soil and Waste Systems |
| Section 15300 | Plumbing Fixtures, Trim and Specialties |
| Section 15350 | Gas Piping System |
| Section 15500 | Fire Protection System |
| Section 15750 | Flow Meters |
| Section 15752 | Rotary –Screw Water Chillers (Air –Cooled) |
| Section 15760 | Modular Indoor Air Handling Units |
| Section 15790 | Modular Rooftop Air Handling Units |

| Section 15800 | HVAC Pumps |
| Section 15810 | Finned Water --Tube Boilers |
| Section 15820 | Ventilation Systems |
| Section 15840 | Air Thermal Units-Variable Volume |
| Section 15860 | Air Distribution System |
| Section 15861 | Spiral Duct |
| Section 15900 | Direct Digital Control System |
| Section 15980 | Variable Frequency Drives |
| Section 15990 | Testing and Balancing Air and Water Systems |

### DIVISION 16    ELECTRICAL CONSTRUCTION

| Section 16010 | Electrical General |
| Section 16110 | Raceways |
| Section 16135 | Ladder Cable Trays |
| Section 16150 | Outlet Boxes and Junction Boxes |
| Section 16250 | Grounding |
| Section 16410 | Conductors |
| Section 16420 | Panelboards |
| Section 16430 | Disconnects& Separately --Mounted Circuit Breakers |
| Section 16435 | Switchboard |
| Section 16440 | Transformers |
| Section 16460 | Switches and Receptacles |
| Section 16490 | Transient Voltage Surge Suppression (TVSS) for Electrical Power Systems |
| Section 16500 | Lighting |
| Section 16505 | Dimming System |
| Section 16506 | Lighting Control System |
| Section 16510 | Motion Detectors |
| Section 16710 | Fire Alarm System |
| Section 16782 | Cable Television |
| Section 16783 | Cable Television System |
| Section 16801 | Telephone and Data Systems |
| Section 16912 | CCTV System |

Initial here:    _____    Triangle Maintenance Service, L.L.C.

## Barksdale Bonding and Insurance Member of Regions Insurance Group

P. O. Box 13389, Jackson, MS 39236

PH 601-981-6700          WATTS 1-800-844-6700          FAX 601-981-9191

Bond No. 83B005726

*AIA Document A312*

# Performance Bond

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

CONTRACTOR (Name and Address):

Panola Construction Co., Inc.
P. O. Box 149
Batesville, MS 38606

SURETY (Name and Principal Place of Business):

Liberty Mutual Insurance Company
175 Berkeley Street
Boston, MA 02116

OWNER (Name and Address):

Hinds Community College
501 East Main Street
Raymond, MS 39154

CONSTRUCTION CONTRACT
Date: June 4, 2009
Amount: $15,048,200.00    Fifteen Million Forty Eight Thousand Two Hundred Dollars and 00/100
Description (Name and Location): Multi-Purpose Center - Hinds Community College, Pearl, Mississippi,
PN: 07037

BOND
Date (Not earlier than Construction Contract Date): June 4, 2009
Amount: $15,048,200.00    Fifteen Million Forty Eight Thousand Two Hundred Dollars and 00/100
Modifications to this Bond:                                ☒ None                          ☐ See Page 3

CONTRACTOR AS PRINCIPAL
Company:                          (Corporate Seal)
Panola Construction Co., Inc.

SURETY Liberty Mutual Insurance Company
Company:                          (Corporate Seal)

Signature: _____
Name and Title:

Signature: _____
Name and Title: Angie M Strickland
                Attorney-in-Fact

(Any additional signatures appear on page 3)

*(FOR INFORMATION ONLY—Name, Address and Telephone)*
AGENT or BROKER:

Barksdale Bonding and Insurance Member of Regions Insurance Group
P. O. Box 13389
Jackson, MS 39236

OWNER'S REPRESENTATIVE (Architect, Engineer or
other party):
Dean and Dean/Associates Architects
P.O. Box 4685
Jackson,  39296

AIA DOCUMENT A312 • PERFORMANCE BOND AND PAYMENT BOND • DECEMBER 1984 ED



EXHIBIT

"2"

**1** The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

**2** If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 3.1.

**3** If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

**3.1** The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

**3.2** The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

**3.3** The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

**4** When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

**4.1** Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

**4.2** Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

**4.3** Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

**4.4** Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

**.1** After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

**.2** Deny liability in whole or in part and notify the Owner citing reasons therefor.

**5** If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Subparagraph 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

**6** After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

**6.1** The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

**6.2** Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and

**6.3** Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

**7** The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators or successors.

**8** The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

**9** Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation avail-

able to sureties as a defense in the jurisdiction of the suit shall be applicable.

10  Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page.

11  When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

12  DEFINITIONS

12.1  Balance of the Contract Price: The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Con-

tractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

12.2  Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

12.3  Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract.

12.4  Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

MODIFICATIONS TO THIS BOND ARE AS FOLLOWS:

(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | (Corporate Seal) | Company: | (Corporate Seal) |

Signature: _____
Name and Title:
Address:

Signature: _____
Name and Title:
Address:

## Barksdale Bonding and Insurance Member of Regions Insurance Group

P. O. Box 13389, Jackson, MS 39236

PH 601-981-6700          WATTS 1-800-844-6700          FAX 601-981-9191

Bond No. 83B005726

*AIA Document A312*

# Payment Bond

**Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.**

---

**CONTRACTOR (Name and Address):**

Panola Construction Co., Inc.
P. O. Box 149
Batesville, MS 38606

**SURETY (Name and Principal Place of Business):**

Liberty Mutual Insurance Company
175 Berkeley Street
Boston, MA 02116

**OWNER (Name and Address):**

Hinds Community College
501 East Main Street
Raymond, MS 39154

**CONSTRUCTION CONTRACT**
Date: June 4, 2009
Amount: $15,048,200.00   Fifteen Million Forty Eight Thousand Two Hundred Dollars and 00/100
Description (Name and Location): Multi-Purpose Center - Hinds Community College, Pearl, Mississippi.
PN: 07037

**BOND**
Date (Not earlier than Construction Contract Date): June 4, 2009
Amount: 15,048,200.00   Fifteen Million Forty Eight Thousand Two Hundred Dollars and 00/100
Modifications to this Bond:                    ☐ None              ☒ See Page 6

| | |
|---|---|
| **CONTRACTOR AS PRINCIPAL**<br>Company:                    (Corporate Seal)<br>Panola Construction Co., Inc. | **SURETY** Liberty Mutual Insurance Company<br>Company:                    (Corporate Seal) |
| Signature: _____<br>Name and Title: | Signature: _____<br>Name and Title: Angie M Strickland<br>                    Attorney-in-Fact |

(Any additional signatures appear on page 6)

---

*(FOR INFORMATION ONLY—Name, Address and Telephone)*
**AGENT or BROKER:**

Barksdale Bonding and Insurance Member of Regions Insurance Group
P. O. Box 13389
Jackson, MS 39236

**OWNER'S REPRESENTATIVE (Architect, Engineer or other party):**
Dean and Dean/Associates Architects
P.O. Box 4685
Jackson,  39296

---

AIA DOCUMENT A312 • PERFORMANCE BOND AND PAYMENT BOND • DECEMBER 1984 ED.

A312-1984   4

1 The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference.

2 With respect to the Owner, this obligation shall be null and void if the Contractor:

2.1 Promptly makes payment, directly or indirectly, for all sums due Claimants, and

2.2 Defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity whose claim, demand, lien or suit is for the payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, provided the Owner has promptly notified the Contractor and the Surety (at the address described in Paragraph 12) of any claims, demands, liens or suits and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety, and provided there is no Owner Default.

3 With respect to Claimants, this obligation shall be null and void if the Contractor promptly makes payment, directly or indirectly, for all sums due.

4 The Surety shall have no obligation to Claimants under this Bond until:

4.1 Claimants who are employed by or have a direct contract with the Contractor have given notice to the Surety (at the address described in Paragraph 12) and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and, with substantial accuracy, the amount of the claim.

4.2 Claimants who do not have a direct contract with the Contractor:

.1 Have furnished written notice to the Contractor and sent a copy, or notice thereof, to the Owner, within 90 days after having last performed labor or last furnished materials or equipment included in the claim stating, with substantial accuracy, the amount of the claim and the name of the party to whom the materials were furnished or supplied or for whom the labor was done or performed; and

.2 Have either received a rejection in whole or in part from the Contractor, or not received within 30 days of furnishing the above notice any communication from the Contractor by which the Contractor has indicated the claim will be paid directly or indirectly; and

.3 Not having been paid within the above 30 days, have sent a written notice to the Surety (at the address described in Paragraph 12) and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and enclosing a copy of the previous written notice furnished to the Contractor.

5 If a notice required by Paragraph 4 is given by the Owner to the Contractor or to the Surety, that is sufficient compliance.

6 When the Claimant has satisfied the conditions of Paragraph 4, the Surety shall promptly and at the Surety's expense take the following actions:

6.1 Send an answer to the Claimant, with a copy to the Owner, within 45 days after receipt of the claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed.

6.2 Pay or arrange for payment of any undisputed amounts.

7 The Surety's total obligation shall not exceed the amount of this Bond, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

8 Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any Construction Performance Bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and the Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

9 The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract. The Owner shall not be liable for payment of any costs or expenses of any Claimant under this Bond, and shall have under this Bond no obligations to make payments to, give notices on behalf of, or otherwise have obligations to Claimants under this Bond.

10 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

11 No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the location in which the work or part of the work is located or after the expiration of one year from the date (1) on which the Claimant gave the notice required by Subparagraph 4.1 or Clause 4.2.3, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (1) or (2) first occurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

12 Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page. Actual receipt of notice by Surety, the Owner or the Contractor, however accomplished, shall be sufficient compliance as of the date received at the address shown on the signature page.

13 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this

AIA DOCUMENT A312 • PERFORMANCE BOND AND PAYMENT BOND • DECEMBER 1984 ED.

A312-1984    5

Bond shall be construed as a statutory bond and not as a common law bond.

14  Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor shall promptly furnish a copy of this Bond or shall permit a copy to be made.

15  DEFINITIONS

15.1  Claimant: An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Contract. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the

Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

15.2  Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

15.3  Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

MODIFICATIONS TO THIS BOND ARE AS FOLLOWS:

Paragraph 6 above is deleted in its entirety and the following is substituted in its place:

6. When the Claimant has satisfied the conditions of Paragraph 4, and has submitted all supporting documentation and any proof of claim requested by the Surety, the Surety shall, with reasonable promptness, notify the Claimant of the amounts that are undisputed and the basis for challenging any amounts that are disputed, including, but not limited to, the lack of substantiating documentation to support the claim as to entitlement or amount, and the Surety shall, with reasonable promptness, pay or make arrangements for payment of any undisputed amount: provided, however, that the failure to the Surety to timely discharge its obligations under this paragraph or to dispute or identify any specific defense to all or any part of a claim shall not be deemed to be an admission of liability by the Surety as to such claim or otherwise constitute a waiver of the Contractor's or Surety's defenses to, or right to dispute, such claim. Rather, the Claimant shall have the immediate right, without further notice, to bring suit against the Surety to enforce any remedy available to it under this Bond.

(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | (Corporate Seal) | Company: | (Corporate Seal) |
| Signature: | | Signature: | |
| Name and Title: | | Name and Title: | |
| Address: | | Address: | |

AIA DOCUMENT A312 • PERFORMANCE BOND AND PAYMENT BOND • DECEMBER 1984 ED.

A312-1984   6

## Bond Details for: 83B005726

|  |  |
|---|---|
| Status: | In Effect |
| Bond Form: | Conforms With AIA A312 Performance and Payment Bond ED 12-84 (Class B) |
| Current Effective Date: | 6/4/2009 |
| Expiration Date: | 9/4/2010 |
| Subsidiary: | Panola Construction Co., Inc. |
| Description: | Multi-Purpose Center - Hinds Community College, Pearl, Mississippi, PN: 0703; |
| Bond Amount: | $15,048,200.00 |
| Contract Amount: | $15,048,200.00 |
| Contract Date: | 6/4/2009 |
| Type of Bond: | Contract |
| SAA Code: | Class B(607) |
| Initial Effective Date: | 6/4/2009 |

### Principal

|  |  |
|---|---|
| Name: | Panola Construction Co., Inc. |
| Address: | P. O. Box 149 |
|  | Batesville, MS 38606 |
| State of Incorporation: | MS |

### Obligee

|  |  |
|---|---|
| Name: | Hinds Community College |
| Address: | 501 East Main Street |
|  | Raymond, MS 39154 |
| State of Obligation: | MS |
| Obligee Type: | unknown |

### Agency Information

|  |  |
|---|---|
| Agency: | Barksdale Bonding and Insurance Member of Regions Insurance Group |
| Site: | Barksdale Bonding and Insurance Member of Regions Insurance Group (MS, Ja |
| Attorney-in-fact: | Angie M Strickland |
| State of Execution: | MS |

### Special Bond Fields

|  |  |
|---|---|
| Agency Fax #: | 601-981-9191 |
| Agency Wats #: | 1-800-844-6700 |
| Check for Modifications: | False |
| Check for Modifications None: | TRUE |
| Local Surety Address: | 175 Berkeley Street |
| Local Surety City: | Boston |
| Local Surety State: | MA |
| Local Surety Zip: | 02116 |

### Other Information

|  |  |
|---|---|
| SurePath ID (Long): | {4C610758-5F08-4465-AC35-48CC59B52290} |
| Bond Validation Number(BVN): | Q1HE-6DW8-KFK2-97WH |

### Issuing Carriers

**Liberty Mutual Insurance Company**

|  |  |
|---|---|
| Bond Number: | 83B005726 |
| Percentage of Business (for Co-Surety): | 100% |
| Total Liability: | $15,048,200.00 |
| Percent Complete: | 0% |

Received
LMS - Memphis
Date: 4/22/09

Outstanding Liability:   $15,048,200.00
Premium Amount:   $89,036.00
Commission Amount:   $12,847.07
State Surcharge:   $0.00
Municipal Tax:   $0.00

Comments
Approved by Bill Robinson - Liberty & FedEx to Panola Const. 5-21-09



179 Highway 51 South
Batesville, MS 38606

December 28, 2010

Mr. Stuart Smith
Triangle Maintenance Service L.L.C.
2044 Highway 182 West
Columbus, MS 39701

Mr. Smith,

This letter is to inform you that Panola Construction Company Inc. (PCC) will no longer
allow Mr. Scott Hannon access to the project known as Multi-Purpose Center Hinds
Community College located at 3805 Highway 80 East in Pearl, Mississippi.

Mr. Hannon is unable to work with or communicate in a professional, harmonious and
courteous manner with PCC personnel and other project personnel. It is the responsibility
of both Triangle Maintenance Service L.L.C. (TM) and PCC to eliminate any opportunity
for additional conflict.

Please understand that PCC is not changing, subsidizing or terminating TMS subcontract
908-2530-503.  PCC is, however, exercising its right under Section 16 of the subcontract
to require a change in Triangle's supervisory personnel. Section 16 is as follows:

*Section 16.*  The Subcontractor shall have at least one competent superintendent present at the Project at all
times work of Subcontractor is being performed or is scheduled to be performed. Said superintendent shall
have absolute authority, in all respects, to act for and on behalf of the Subcontractor and to bind the
Subcontractor.  The Subcontractor shall replace said superintendent or any other employee, without
additional charge, if so demanded by the Contractor. The Subcontractor shall do, without additional charge
whatever is necessary in the performance of this Subcontract or as the Contractor otherwise directs to
assure harmonious labor relations at the Project and to prevent strikes or other labor disputes.

In PCC's opinion, Mr. Hannon is no longer able to perform TMS remaining duties for
this project and PCC directs that he be replaced.

After today, Mr. Hannon will no longer be permitted to enter the project site. Any entry
by Mr. Hannon will be deemed trespassing and appropriate legal actions will result.

If you should have any questions regarding this matter, please contact me at our
Batesville, Mississippi office.

Sincerely,

William F. Burnett
President
Panola Construction

EXHIBIT

"3"



179 Highway 51 South
Batesville, MS 38606

January 27, 2011

Mr. Stuart Smith
Triangle Maintenance Service L.L.C.
2044 Highway 182 West
Columbus, MS 39701

Mr. Smith,

This letter is to inform you that Panola Construction Company Inc. (PCC) requests Triangle Maintenance Service L.L.C. (TM) to the man the project known as Multi-Purpose Center Hinds Community College located at 3805 Highway 80 East in Pearl, Mississippi with a competent superintendent.

In light of damages caused by TM employees, to accepted and finished work, on January 26, 2011, it would be mutually beneficial to prevent other incidents. It shall be the responsibility of Triangle Maintenance Service L.L.C. (TM) to have this party on-site no later that January 31, 2011.

Please understand that PCC is not changing, subsidizing or terminating TMS subcontract 908-2530-503. PCC is, however, exercising its right under Section 16 of the subcontract to require a change in Triangle's supervisory personnel. Section 16 is as follows:

*Section 16.* The Subcontractor shall have at least one competent superintendent present at the Project at all times work of Subcontractor is being performed or is scheduled to be performed. Said superintendent shall have absolute authority, in all respects, to act for and on behalf of the Subcontractor and to bind the Subcontractor. The Subcontractor shall replace said superintendent or any other employee, without additional charge, if so demanded by the Contractor. The Subcontractor shall do, without additional charge whatever is necessary in the performance of this Subcontract or as the Contractor otherwise directs to assure harmonious labor relations at the Project and to prevent strikes or other labor disputes.

In PCC's opinion, also this party shall be accompanied by additional man power to allow for completion of your Company's scope-of-work and punch list items on or before the project completion date.

If you should have any questions regarding this matter, please contact me at our Batesville, Mississippi office.

Sincerely,

Jeffrey H. Papasan
Vice President
Panola Construction

EXHIBIT

tabbies

"4"



179 Highway 51 South
Batesville, MS 38606

February 9, 2011

Mr. Stuart Smith
Triangle Maintenance Service L.L.C.
2044 Highway 182 West
Columbus, MS 39701

Mr. Smith,

Per this letter, Panola Construction Company Inc. (PCC) after review of  Triangle
Maintenance Service L.L.C. (TM) Subcontract 908-02530-503 for the project known as
Multi-Purpose Center Hinds Community College located at 3805 Highway 80 East in
Pearl, Mississippi has concluded the following:

- In light of incomplete, damaged or unacceptable work, PCC shall continue to
  supplement TM with completion of subcontracted scope-of-work.

- All remaining subcontract funds ($135,684.96), not dispersed to TMS, and shall
  be held.

Please understand that PCC is not changing, subsidizing or terminating TMS subcontract
908-2530-503.  PCC is, however, exercising its right under Section 11 of the subcontract
to hold funds until TMS scope-of-work is complete. Section 11 is as follows:

*Section 11.*   Should the Subcontractor fail to operate in the ordinary course of business or, at any time, refuse, neglect,
or fail: to furnish and maintain sufficient labor, material, equipment, services, or supervision, or to pay for labor,
equipment or material used by the Subcontractor, or to prosecute the work covered by this Subcontract with promptness
and diligence so as not to delay its work, the work of others, or the Project as a whole, or to perform any term or
condition of this Subcontract, all of which are considered material, then upon any one of these events, the Contractor
may, at its option, after three (3) days written notice to Subcontractor, or such shorter time as may be appropriate under
the circumstances, either (1) supplement the Subcontractor with labor, material, and equipment; or (2) terminate this
Subcontract in whole or in part and complete the action which the Contractor in good faith deems reasonable under the
circumstances. In the event of any failure or inadequacy of performance by the Subcontractor, the Subcontractor shall
be liable to the Contractor for all expenditures made and all damages, losses, expenses, attorneys' fees, and costs of
whatever nature, incurred by the Contractor in supplementing the Subcontractor, in completing the Subcontract, or
otherwise as a result of Subcontractor's performance delays or failures.

If you should have any questions regarding this matter, please contact me at our
Batesville, Mississippi office.

Sincerely,

Jeffrey H. Papasan
Vice President
Panola Construction

Cc: William F. Burnett Jr. President, Panola Construction

EXHIBIT

tabbies

"5"



Post Office Box 2313, Columbus, MS 39704

February 10, 2011

Mr. Jeffrey H. Papasan
Panola Construction
179 Highway 51 South
Batesville, Mississippi 38606

*Via email to: jpapasan@panolaconstruction.com and U.S. Mail*

RE:    Multi-Purpose Center
       Hinds Community College
       Pearl, Mississippi

Dear Mr. Papasan,

I have reviewed your letter of February 9, 2010 regarding our subcontract agreement on the above referenced project. As you are well aware from previous correspondence, supplementation of my workforce has not been required nor is it required at this point in the project with two weeks or less of completing my punch list items and final application of sealer. Further, I am not aware of any incomplete or damaged work.

Any and all delays in this project, especially our work, are a direct result of Panola Construction's failure to provide competent site and project management as well as your ability to properly and adequately maintain a project schedule specifically scheduling of prerequisite trades to keep the project moving forward. Hence the reason this project will be completed more than six months late.

Your determination to exercise your rights under Section 11 of the subcontract agreement does not provide you the right to withhold my pay requests. You are holding in excess of $58,000 in retainage which is more than adequate to cover any potential liability. Further, contrary to your assertion I must execute Change Order #7 to have my payment released, Section 10, Paragraph 2 of the subcontract permits you to withhold these funds from my pay requests without action on my part.

As I have stated in previous correspondence, this action as well as your previous actions the past few weeks are clearly an attempt by Panola to avoid making proper and due payment to Triangle



EXHIBIT

"6"

Panola Construction
February 10, 2011
Page 2

Maintenance Service for our Pay Request #7 dated December 20, 2010 for which Panola has previously been paid. These actions constitute a breach of the subcontract agreement. Triangle Maintenance Service, LLC. has and continues to be significantly damaged by the actions of Panola Construction.

At this point I formally demand payment of my Pay Request #7 dated December 20, 2010 in the amount of $80,980.59. If payment is not received in my office by the close of business on Tuesday, February 15, 2011 I will proceed to protect my interest with the immediate issuance of a Stop Notice to the owner, notification to your bonding company and litigation to recover the damages Panola Construction has caused to Triangle Maintenance Service, LLC.

Very truly yours,
TRIANGLE MAINTENANCE SERVICE, LLC.

Scott C. Hannon
Managing Member

cc:     Mr. William T. Cooper - Nichols, Crowell, Gillis, Cooper & Amos, PA.
        project file #1135

**From:**          Ronnie Stepp <rstepp@panolaconstruction.com>
**Sent:**          Friday, February 11, 2011 7:48 AM
**To:**            Jeff Papasan; Bill Burnett
**Cc:**            'Chris Burnett'
**Subject:**       TMS

Looks like they may not return . Do we lock up what is here or let it pass. Rickey ask ????

Ronnie


EXHIBIT
"7"



179 Highway 51 South
Batesville, MS 38606

February 18, 2011

VIA FACSIMILE (662-327-0059) & U. S. MAIL
Mr. Stuart Smith
Triangle Maintenance Service L.L.C.
2044 Highway 182 West
Columbus, MS 39701

Re:   **NOTICE OF TERMINATION OF SUBCONTRACT**
      Multi-Purpose Center Hinds Community College, Pearl, MS

Dear Mr. Smith:

Pursuant to Section 11 of the Subcontract between Triangle Maintenance Service L.L.C.
("Triangle") and Panola Construction Co., Inc. ("Panola") dated effective July 6, 2009
("Subcontract"), you are hereby notified that the Subcontract is terminated effective
immediately. Panola's reasons for termination are, among others, as follows:

    1.    Triangle was previously notified by letters dated January 27 and February
9, 2011, of your failure to properly man the project and various deficiencies in
your work requiring Panola to supplement your forces. Triangle has failed to cure
its previous defaults and continues to perform unacceptable work in spite of
Panola's previous notices to you and the passage of more than sufficient time to
correct these deficiencies.

    2.    Section 4 of the Subcontract mandates that time is of the essence to
Triangle's obligations. Triangle has repeatedly delayed and disrupted the
progress of this project. Triangle has made the work of Panola more expensive on
this project. As provided in Section 4 and other provisions of the Subcontract,
Triangle is responsible to Panola for all increased costs as a result of these delays
and disruptions.

    3.    Under Section 6 of the Subcontract, Triangle has guaranteed the quality of
its work. Triangle has failed to supply good material and workmanship and has
repeatedly failed to comply strictly with the plans and specifications for the
project.

    4.    Section 10 of the Subcontract requires Triangle to supply a sufficient
number of workmen to the project. Triangle has repeatedly failed to provide
adequate and timely manpower to the project after being requested to do so.

As a result of these numerous breaches of contract, Panola has elected to terminate your
Subcontract immediately effective as of the date of this letter. Any and all employees



**EXHIBIT**

"8"

and/or representatives of Triangle are no longer permitted to enter the jobsite unless authorized in advance by an officer of Panola who is empowered to grant such permission.

You are reminded that Triangle remains liable to Panola for all expenditures made and for all damage, losses, expenses, attorneys' fees and costs of whatever nature incurred by Panola in completing Triangle's subcontract work.

If you should have any questions regarding this matter, please contact me at our Batesville, Mississippi office.

Sincerely,

Jeffrey H. Papasan
Vice President
Panola Construction

Cc: William F. Burnett Jr. President, Panola Construction

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF MISSISSIPPI, EASTERN DIVISION

IN RE:TRIANGLE MAINTENANCE SERVICE, LLC        **NO.: 11-15142-DWH**
   (DEBTOR)

---

TRIANGLE MAINTENANCE SERVICE, LLC        **PLAINTIFF**

V.        **ADVERSARY PROCEEDING NO. 12-01020-DWH**

LIBERTY MUTUAL INSURANCE COMPANY        **DEFENDANT**

### AFFIDAVIT OF RICKEY MOORE

STATE OF MISSISSIPPI

COUNTY OF _Panola_

    1.    I am an adult resident citizen of the State of Mississippi. I am not under any disabilities that would prevent me from remembering facts or testifying truthfully.

    2.    The facts I am stating in this affidavit are based upon my personal knowledge, including a review of Liberty Mutual's Motion for Summary Judgment and its attachments, as well as my own memory of what happened, to the best that I am able to recall.

    3.    I am an employee of Panola Construction Company, and was a construction supervisor on the Hinds Community College project. During this project I was typically present at the work site when any work was being done. I worked with Ronnie Stepp of Panola Construction, and I also worked with various people employed by the project's subcontractors, including Triangle Maintenance Service.



4.     During Triangle Maintenance Service's work on the project, there were concerns over whether Triangle was supplying an adequate number of workers to get its work done, and whether the quality of the work Triangle was doing would be accepted by the owner.

5.     Sometime before February 11, 2011, Triangle Maintenance Services left the job site. Since it appeared that no Triangle workers would be returning, I asked Ronnie Stepp whether we should lock up the things that Triangle's employees had left behind. I am not aware of any employee of Triangle Maintenance working on the project after that date.

BE IT FURTHER, AFFIANT SAYETH NOT.

Rickey Moore

STATE OF MISSISSIPPI
COUNTY OF _Panola_

PERSONALLY APPEARED BEFORE ME, the undersigned authority in the state and county aforesaid, RICKEY MOORE, who swore or affirmed that the facts contained in this affidavit were true and correct.

Notary Public

My commission expires: